Jane Doe, PhD
1217 Wilshire Blvd.
Santa Monica, CA, 90403
(310) 409-6130
Email:  doeplaintiffphd@gmail.com


JANE DOE, PhD, IN PRO PER

```
┌─────────────────────────────────────┐
│               FILED                  │
│                                      │
│   CLERK, U.S. DISTRICT COURT         │
│                                      │
│        ┌──────────────┐              │
│        │   5/5/25     │              │
│        └──────────────┘              │
│                                      │
│   CENTRAL DISTRICT OF CALIFORNIA     │
│                                      │
│   BY _____ CS _____ DEPUTY     │
│                                      │
│   DOCUMENT SUBMITTED THROUGH THE     │
│ ELECTRONIC DOCUMENT SUBMISSION SYSTEM│
└─────────────────────────────────────┘
```

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE DOE, an individual, | ) Case No. 2:25-cv-02191-HDV-KES |
| Plaintiff, | ) |
| vs. | ) **FIRST AMENDED COMPLAINT FOR DEFAMATION** |
| JOHN ROE 1, an individual; JOHN ROE 2, an individual; and DOES 1-100, inclusive, | ) [Filed as of Right Pursuant to Fed. R. Civ. P. 15(a)(1)(B)] |
| Defendants. | ) Assigned for All Purposes to: Hon. Hernan D. Vera |
| | ) Courtroom: 5B |
| | ) Date of Filing: May 5, 2025 |
| | ) Original Complaint Filed: January 19, 2024 |
| | ) Trial Date: Not Set |
| | ) State Court Case No. 24STCV01533 |

- 1 -

FIRST AMENDED COMPLAINT

1

## I. INTRODUCTION

2

3    This is a defamation action brought by a California-based academic, Plaintiff Jane Doe, PhD

4    against out-of-state defendants who, through negligent misstatements and omissions, caused

5    substantial reputational and professional harm by providing inaccurate information to an online

6    news outlet. This negligence culminated in the publication of an online article by *Florida*

7    *Politics* on or about January 22, 2023, titled **"Ghosted: Double life of UCF professor unravels"**,

8    which falsely suggested that Plaintiff's career had "unraveled" and that she had "secretly" held dual

9    academic appointments—statements that were both misleading and demonstrably false.  At the time

10   of publication, Plaintiff maintained a longstanding California residence, and the alleged harm—

11   including canceled interviews, lost job opportunities, and reputational injury—occurred primarily in

12   California.

13

14        Plaintiff has lived in California for nearly two decades, maintaining the same residence, and

15   vehicle registration throughout the relevant period. Defendants were not only aware of Plaintiff's

16   California ties, but also actively engaged in business dealings connected to California. Specifically,

17   Defendants:

18

19   1.   Expressly approved Plaintiff's dual appointment with the University of California, Los

20        Angeles ("UCLA"), demonstrating their knowledge of and consent to Plaintiff's

21        professional activities in California;

22   2.   Authorized and funded travel for Plaintiff's graduate student to visit UCLA in California to

23        learn Magnetic Resonance Imaging ("MRI") and neuroimaging techniques;

24   3.   Approved and acknowledged Plaintiff's publications that listed both UCF and UCLA

25        affiliations;

26

27

28

FIRST AMENDED COMPLAINT

4.   Knew or reasonably should have known that any statements concerning Plaintiff's professional conduct and reputation would directly impact her standing within California's academic and research communities.

As detailed in public records obtained under Florida's Sunshine Law, Defendants served as the primary source of the inaccurate information published in the article. In an email to Plaintiff's prior counsel, a representative from Florida Politics confirmed that the content was based entirely on information provided by Defendants. Defendants were aware of the journalist's stated deadline for the story. After this deadline had passed, Defendants forwarded a relevant response from Plaintiff to the journalist, who subsequently published a more balanced second article—further illustrating how Defendants' failure to provide timely information and context contributed to the **defamatory nature** of the original publication.These facts are supported by documentary evidence previously submitted to the Court and/or attached hereto.

## II. THE PARTIES

1.   **Plaintiff Jane Doe** ("Plaintiff") is an individual domiciled in the County of Los Angeles, State of California. Plaintiff is a private individual and resident of the forum state at all relevant times.

2.   **Defendant University of Central Florida Board of Trustees** is a public entity organized under the laws of the State of Florida, with its principal place of business in Orlando, Florida. At all relevant times, Defendant acted through its employees, agents, and officials, some of whom are currently unknown to Plaintiff.

3.   **Defendants John Roe 1 through 100** are individuals, entities, or organizations whose true names and capacities are presently unknown to Plaintiff. Plaintiff alleges that each such fictitiously named Defendant is in some manner responsible for the actions, omissions,

events, transactions, and circumstances alleged herein. The true names and capacities of

such fictitiously named Defendants, whether individual, corporate, associate, or otherwise,

are presently unknown to Plaintiff.  Plaintiff will seek leave of Court to amend the

Complaint to assert the true names and capacities of such fictitiously named Defendants

when the same have been ascertained.

4. Plaintiff is informed and believes, and thereon alleges, that Defendants, and each of them -
   including the fictitiously named John Roe Defendants - were acting as agents, employees,
   representatives, or joint venturers of one another and were acting within the course and
   scope of such relationships at all times relevant to the claims herein.

5. For purposes of this Complaint, the term "**Defendants**" shall refer collectively to the
   University of Central Florida Board of Trustees and the fictitiously named John Roe
   Defendants, unless otherwise specified.

### III. JURISDICTION AND VENUE

6. Plaintiff files this First Amended Complaint in response to Defendant's motion to dismiss,
   and does so without waiving her pending Motion to Remand or conceding that federal
   jurisdiction is proper. In the event the Court denies remand, Plaintiff alleges the following
   jurisdictional facts without prejudice to her remand arguments.

7. This Court has personal jurisdiction over Defendant University of Central Florida Board of
   Trustees ("UCF") because UCF purposefully directed its conduct toward Plaintiff, a
   California resident, foreseeably knowing that the effects of its conduct would be felt in
   California. UCF communicated with a Florida-based media outlet, *Florida Politics*,
   regarding Plaintiff, and selectively disclosed information that foreseeably caused
   reputational and economic harm to Plaintiff in California.

8. Plaintiff Jane Doe is, and at all relevant times was, domiciled in the State of California. Plaintiff was born in California, has continuously maintained her residence in California for over 18 years, has paid utility bills during all relevant times, holds a valid California driver's license, is registered to vote in California, and owns a vehicle registered in California. In prior filings with this Court, Plaintiff submitted redacted utility bills and vehicle registration documents further demonstrating her longstanding California domicile.

9. Plaintiff's professional and academic work was largely rooted in California, including her long-standing affiliation with the University of California, Los Angeles ("UCLA"), where Plaintiff completed her PhD work. Plaintiff also maintained ongoing professional obligations and research collaborations within the state.

10. UCF was fully aware of Plaintiff's significant California ties. Plaintiff's appointment with UCLA was disclosed to UCF in annual reports signed and approved by UCF supervisors. Plaintiff published with both UCLA and UCF affiliations where appropriate, and these publications were disclosed on approved annual reports. UCF funds were used to reimburse UCF student travel to California to work and study with Plaintiff at UCLA and UCF approved numerous activities with UCLA as part of Plaintiff's official academic and mentorship work.

11. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claim occurred in this district, and the injuries suffered by Plaintiff—including reputational and professional harm—were sustained primarily in California.

12. Jurisdiction and venue are further supported under the "effects test" established in *Calder v. Jones*, 465 U.S. 783 (1984), because although Defendants' statements were made to an out-of-state media outlet, they concerned a California resident and were published in a manner that foreseeably caused reputational harm within California.

13. California maintains a compelling interest in protecting the rights and reputations of its residents against defamatory actions originating from outside the state. Upholding jurisdiction in this matter aligns with California's commitment to safeguarding its citizens from reputational harm inflicted by out-of-state actors.

## FACTUAL BACKGROUND

### A. Plaintiff's Academic and Professional Standing

14. Plaintiff Jane Doe is a computational neuroscientist whose research lies at the intersection of neuroscience, neuroimaging, and pattern recognition algorithms. She began her academic career studying biomedical engineering at the Johns Hopkins University, where she published research on genetics. She completed her master's degree at the University of Pennsylvania, where she began investigating the neurological basis of Parkinson's disease. Plaintiff continued this line of inquiry during her doctoral studies, where she completed her PhD at the University of California, Los Angeles ("UCLA") in the neuroengineering program. Her PhD dissertation work focused on environmental effects that can cause Parkinsonism, specifically manganese inhalation which can arise from a variety of workplace settings such as mining or welding. Plaintiff began learning neuroimaging techniques, including magnetic resonance imaging ("MRI"), under her PhD co-mentor, who is a pioneer in the field of functional MRI.

15. After completing her PhD at UCLA, Plaintiff began her postdoctoral work at UCLA, where she applied advanced machine learning techniques to study patterns of brain activity for diagnostic and predictive purposes. Plaintiff applied these techniques to neuroimaging data to gain insight into a number of neurologic diseases including Alzheimer's, attention-

deficit/hyperactivity disorder (ADHD), and epilepsy. Plaintiff's recent work has explored

the effects of low-intensity transcranial focused ultrasound on electroencephalography

("EEG") signals — a promising non-invasive technique with potential therapeutic

applications for anxiety, memory loss in Alzheimer's, and Parkinson's disease.

16. Throughout her academic career, Plaintiff has authored or co-authored over **50** peer-

reviewed publications in leading scientific journals, including contributing to a widely cited

article in *The Lancet Neurology*. Her research has been cited more than **4,000 times**, and she

holds an **h-index of 24**, reflecting the sustained impact and recognition of her work within

the scientific community.

17. Plaintiff's scholarship spans multiple disciplines, including studies on childhood-onset

neurodevelopmental disorders and advanced data mining techniques. In addition to her

scholarly publications, Plaintiff has delivered lectures at some of the most prestigious

scientific meetings and academic symposia in over **20 countries**, including the Organization

for Human Brain Mapping (OHBM), a keynote address at the Computational and Systems

Neuroscience (COSYNE**)** scientific meeting, and the **National Institute of Mental Health**

**(NIMH)** in Washington, D.C. Her reputation for academic excellence is reflected in these

invitations and in her ongoing contributions to the advancement of neuroscience and

neuroimaging.

**B. Plaintiff's Employment at UCF and at UCLA**

18. In 2015, Plaintiff served as a visiting postdoctoral scholar at University College London.

Upon returning to the United States, she was appointed as a non-tenure-track Adjunct

Assistant Professor and Researcher at the University of California, Los Angeles ("UCLA")

in the Department of Psychiatry and Biobehavioral Medicine.

FIRST AMENDED COMPLAINT

19. In the fall of 2016, Plaintiff was hired as a tenure-track Assistant Professor at the University of Central Florida ("UCF"). In this role, Plaintiff mentored graduate students, taught courses, secured competitive grant funding, and published original research.

20. Defendants were fully aware of Plaintiff's concurrent appointment with UCF and UCLA. When Plaintiff was hired at UCF, her supervisor expressly agreed that she could maintain her UCLA appointment. UCF Directors, Dr. Charlie Hughes and Dr. R. Paul Wiegand were aware of Plaintiff's concurrent appointment (Exhibit A). Plaintiff's colleagues at UCLA were also aware of her concurrent appointment. Such arrangements were not uncommon, as several other faculty members at UCF also held concurrent affiliations with other universities.

21. Plaintiff regularly submitted annual reports to UCF listing her UCLA affiliation.  Plaintiff co-authored a number of scientific papers with members of the UCF community with both affiliations, which were disclosed on these annual reports. Listing multiple affiliations, where appropriate, reflects a common practice among faculty at UCF, UCLA, and within the global scientific community.  Plaintiff's publications with both affiliations were even brought to the awareness of Defendants by a journalist from *Florida Politics*. These annual reports were signed and formally approved by UCF supervisors.

22. In addition, Plaintiff involved UCF graduate students in joint research efforts. UCF approved funding and travel for Plaintiff's student to visit her UCLA laboratory to receive training in magnetic resonance imaging (MRI) and other neuroimaging techniques, as indicated by student submitted travel request forms (Exhibit B). This arrangement was transparent, academically productive, and formally approved by UCF faculty and administrators via travel request forms.

23. Plaintiff was invited to lecture at numerous highly-selective scientific conferences and speaker series in the time leading up to the pandemic. Travel to these scientific meetings

was formally approved by UCF travel request forms ("TRFs) submitted by Plaintiff. UCF approved Plaintiff's request to "buyout" of her teaching commitment in order to attend and deliver lectures at these events (Exhibit A), which was beneficial financially for the department, a fact which Defendants were aware of.

24. UCF had no written policy requiring in-person attendance, and it was common for other faculty members in Plaintiff's department to work remotely for extended periods - even prior to the COVID-19 pandemic. At all times, Plaintiff complied with university protocols.

25. During her time at UCF, Plaintiff received high marks in her Student Perception of Instruction ("SPI") evaluations, a fact known to Defendants.

26. Following the pandemic, Plaintiff began reporting to a new supervisor at UCF who requested that faculty and staff submit formal remote work request forms. Plaintiff complied with this directive and submitted a written remote work request outlining her plan to continue active, grant-funded research in cognitive neuroscience (Exhibit C). In her written justification, Plaintiff referenced the Staglin Center for Cognitive Neuroscience ("CCN"), a research center housed within UCLA, where she had previously conducted collaborative work and brought UCF graduate students for MRI training with administrative approval. Although the form did not explicitly name UCLA, Plaintiff's affiliation with UCLA was well known to UCF administrators and had been previously documented in annual reports, peer-reviewed publications, and travel request forms. The remote work request was formally approved by UCF officials, further confirming institutional awareness and authorization of Plaintiff's continued off-site academic activity.

27. In 2022, Plaintiff formally submitted her tenure dossier for review. As part of this process, UCF contacted four external reviewers to provide letters evaluating Plaintiff's work and advancement to tenure. These letters collectively attested to Plaintiff's unwavering

dedication to her profession, her substantial contributions to the field, and the high regard in

which she is held within the academic community.

28. On or about April 1, 2022, Plaintiff resigned from her appointment at UCLA following the

conclusion of her grant-funded work at that institution, and was told that she could maintain

an honorary appointment to support ongoing collaborations and research activities.

29. On or about October 20, 2022, UCF issued a Notice of Intent to Terminate Plaintiff's

employment, providing a ten-day window for a written response.

30. On or about October 31, 2022, Plaintiff submitted a timely written response to the notice of

intent to terminate, stating her belief that UCF's decision was biased, and based on false

information. Defendants had actual and constructive knowledge of this written response by

Plaintiff, and the relevant journalist at *Florida Politics* even requested this written response

- prior to the publication of the first Article.

31. On or about November 1, 2022, Plaintiff was formally terminated from her position at UCF.

## C. Florida Politics Publishes First (Defamatory) Article

32. On or about January 22, 2023, Florida Politics LLC ("Florida Politics") negligently

published a false, misleading, and defamatory web-based article with the headline,

"Ghosted: Double life of UCF professor unravels" (the "Article"). The Article and the

headline itself was negligently false, misleading, and defamatory. The Article negligently

claimed that Plaintiff's career had "unraveled," and that Plaintiff "secretly" held dual

appointments at UCLA and UCF. However, as discussed above, there was nothing "secret"

about Plaintiff's dual appointment, which was known and condoned by both universities, a

fact which Defendants were aware of. Such dual appointments are standard in the academic

community.

33. Florida Politics negligently stated the falsehoods that Plaintiff led a "double life" and "secretly" held these two positions despite knowing that there was nothing secret about Plaintiff's dual appointment. Florida Politics was aware that Plaintiff published with both affiliations, as demonstrated by correspondence between Defendants and Florida Politics. Plaintiff frequently published and delivered lectured under both affiliations many of which are easily found online. Relevant supervisors were aware of this arrangement, as were Defendants.  Multiple academic affiliations are common in Plaintiff's field. Therefore, this claim in the Article was negligently false and defamatory.

34. Florida Politics's statement that Plaintiff's career had "unraveled" was negligently false when made. After leaving UCF, Plaintiff had invitations to interview at other universities, including Stanford, University of Miami, and was also engaged in discussions about formally returning to teach at UCLA. At the relevant time, Plaintiff also had scientific publications and grants under review and was scheduled to participate in upcoming scientific meetings, including a speaking invitation at the Institute of Pure and Applied Mathematics ("IPAM") - located on UCLA campus - which occurred in January 2023, prior to the online publication by Defendant Florida Politics. Thus, Plaintiff's career had not 'unraveled' at the time the Article was published.

**D. Republication by Defendant College Fix**

35. In January of 2023, the web-based publisher, *College Fix*, published an online article entitled, "Professor secretly held two full-time jobs on opposite coasts." The body of this article restated and paraphrased the content of the Article published by Florida Politics. This article perpetuated the false narrative damaging Plaintiff's professional reputation by re-asserting the falsehood that her dual university positions were held in secret.

36. *College Fix* made no effort to contact her for comment and/or her response.

- 11 -
FIRST AMENDED COMPLAINT

37. *College Fix* exhibited negligence by widely disseminating this paraphrased version of the original Article without making any effort to contact Plaintiff for comment. This lack of due diligence prior to publication further compounded the false narrative, contributing to the widespread dissemination of damaging misinformation about Plaintiff's professional reputation.

**E. Defendant's Role in Florida Politics Article and Subsequent Publication**

38. Plaintiff's prior legal counsel obtained numerous email communications between *Florida Politics* and Defendants through a public records request under Florida's Sunshine Law. These emails reveal that Defendants played a central role in shaping the narrative of the original article by selectively providing information about Plaintiff's employment and academic activities. In a separate email to Plaintiff's former counsel, a representative from *Florida Politics* stated that all of the statements about Plaintiff were based on official reports from UCF, confirming that the publication relied entirely on information provided by Defendants.

39. In one of the email exchanges produced under Florida's Sunshine Law, a journalist from *Florida Politics* stated that she found Plaintiff's scientific publications online that showed both UCF and UCLA affiliations (Exhibit D). Despite being brought to Defendants attention, Defendants made no effort to correct the misleading narrative that Plaintiff had concealed her concurrent appointment—an omission that directly contributed to the defamatory portrayal in the Article.

40. In another email exchange between Defendants and *Florida Politics,* the journalist explicitly asked Defendants for a "mug shot" of Plaintiff, signaling a clear intent to frame the story in a negative light. In the same exchange, the journalist again requested Plaintiff's written

response to the termination notice (Exhibit E). Despite this request, Defendants negligently failed to produce the written response in a timely manner.

41. According to the Article, Defendants suggested that Plaintiff was often absent in the time prior to the pandemic, despite the university approving her travel,  her teaching "buyout" (Exhibit A), having no formal written policy requiring in-person work, and other faculty in Plaintiff's department working remotely for extended periods of time prior to the pandemic. Defendants were fully aware of these facts. The implication that Plaintiff was improperly absent or neglecting her duties directly impugned her professional competence and integrity, and was therefore defamatory.

42. Prior to publication, on or about January 19, 2023, Defendant Florida Politics wrote to UCF asking for comments in response to the then-unpublished Article. Florida Politics was able to receive such comments from Defendants. Although Defendants provided certain comments, they negligently failed to correct the false narrative presented in the article (Exhibit F).

43. Defendants knowingly contributed to the dissemination of the false and defamatory article by distributing a link to it via the UCF News email listserv. This republication by Defendants further amplified the defamatory content and compounded the harm to Plaintiff's professional reputation (Exhibit G).

44. Defendants were aware of Florida Politics's intended deadline for publication, but failed to provide Plaintiff's written response in a timely manner.  Instead, Defendants forwarded the written response after the article was published (Exhibit H), thus representing gross negligence that directly contributed to significant damage to the Plaintiff's professional reputation.

45. Following receipt of Plaintiff's written response, *Florida Politics* published a second article ("Article 2") on or about February 9, 2023. Article 2 presented a significantly more

balanced, factually accurate, and favorable account of Plaintiff's professional circumstances. Thus, this additional information – provided only after the publication deadline by Defendants - was **crucial** to correct the false and misleading narrative in the original Article. However, the original Article remained publicly accessible and continued to circulate online, causing catastrophic damage to Plaintiff's career and severe emotional distress.

46. UCF has demonstrated a pattern of investigating its scientists, faculty, and graduate students based on false allegations and negligently releasing these false allegations to the press. On or about January 27, 2020, the Orlando Sentinel published an article, based on information provided by UCF, that caused tremendous reputational harm to three faculty members who were fired from UCF. Plaintiff has since learned that these faculty members were cleared of these false allegations.

**G. Resulting Harm to Plaintiff**

47. Scientists rely very heavily on their reputation. Plaintiff was an active part of the neuroimaging scientific community. While some of her colleagues have phoned to ask her about the article, the harm to her reputation has resulted in a lack of calls and invitations to academic and professional events.

48. People often lose their jobs and are subsequently able to find new employment and carry on with successful careers. However, the Article negligently published by Florida Politics based on information provided by Roe 1 and Roe 2 of UCF was devastating to Plaintiff's career and reputation. Plaintiff's invitations to interview at the University of Miami and Stanford were rescinded. She was also unable to obtain a teaching position in the UCLA Psychology Department.

49. Prior to the Article's publication, Plaintiff was told by her former supervisor at UCLA that she could retain an honorary affiliation with UCLA in the Department of Psychiatry and Biobehavioral Medicine following her resignation. However, after the Article's publication, correspondence with the new head of this department at UCLA indicated an unwillingness to even engage in communication with Plaintiff.

### FIRST CAUSE OF ACTION

### Negligent Defamation

*As Against Defendant University of Central Florida Board of Trustees and Roes 1 through 100*

50. Plaintiff incorporates by reference each and every allegation of paragraphs 1 through 49, inclusive, as though fully set forth herein.

51. The defamatory statements published in the Article and subsequent paraphrased articles are false and were based on information provided by, and statements made by, Defendants.

52. As outlined extensively above, Defendants acted unreasonably and negligently in making and disseminating these false statements.

53. The Article contained statements from Defendants that exposed Plaintiff to contempt, ridicule, and disgrace, and which had a natural tendency to injure her personal and professional reputation.

54. The defamatory statements were "of and concerning" Plaintiff, and persons reading the Article would reasonably understand the references to apply to Plaintiff.

55. The statements are defamatory on their face and caused Plaintiff to be shunned or avoided, tending to injure her in her profession.

56. Defendants' statements are libelous per se, as they falsely impute professional misconduct and wrongdoing, and are actionable without the need for further explanation, inducement, or innuendo.

57. Defendants' false statements significantly injured Plaintiff in her professional reputation and standing by falsely stating that she secretly held dual academic appointments to the detriment of both institutions.

58. The defamatory statements in the Article were unprivileged. They were not opinion, satire, or fair comment. The Article purports to report factual allegations that were demonstrably false.

59. Upon information and belief, the defamatory statements were published negligently and without reasonable investigation into their truth or accuracy, in a manner lacking due care and departing from accepted standards of professional reporting and conduct.

60. As a direct and proximate result of the above-described conduct, Plaintiff has suffered general and special damages in an amount to be determined at trial, including damage to her reputation, career, and standing in the community.

61. Defendants' actions also resulted in republication of the defamatory statements by third parties, causing additional and continuing harm to Plaintiff.

## **PRAYER FOR RELIEF**

**WHEREFORE Plaintiff prays for judgment against Defendants as follows:**

ON THE FIRST CAUSE OF ACTION:

1. For actual and special damages in an amount to be proven at trial;

2. For a public retraction of the defamatory statements;

1

3. For the costs of suit as against Defendants;

2

3

4. For pre-judgment and post-judgment interest as allowed by law; and

4

5. For such other and further relief as the Court may deem just and proper.

5

6

7

8

9

I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

10

11

Dated: May 5, 2025

Respectfully submitted,

12

13

**/s/ Jane Doe**

14

**Jane Doe, PhD**

15

Plaintiff, In Pro Per

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT

1
2
3
4
5
6
7
8
9
10
11                                    EXHIBIT A
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FIRST AMENDED COMPLAINT



U N I V E R S I T Y   O F   C E N T R A L   F L O R I D A

**Computer Science**
4000 Central Florida Blvd.
Harris Engineering, Suite 437
PO Box 162363
Orlando, FL  32816-2362

April 27, 2023

Re: Letter for Dr. ████████████.

To whom it may concern:

This letter is regarding Dr. ████████████ and her appointment in the School of Modeling, Simulation and Training (SMST) at the ██ n vers ty o ██ entral Florida (UCF . I first met Dr. ██████ when she was invited to a campus interview at UCF in the spring of 2016. Dr. ██████ joined t e epartment in the fall of 2016 as a 9-month tenure-track Assistant Professor.

Each year, Dr. ██████ completed Cumulative Progress Evaluations (CPEs), as a re uirement for a tenure-earning faculty member. These normally begin during year 2. However, Dr. ██████ negotiated one-year of time towards tenure when she joined UCF, so she began submitting these during her first year in the department. As part of this process, Dr. ████ was asked to report publications, grants, and teaching activities. Dr. ████'s publications often indicated both of her academic affiliations, given that her work typically involved analyzing large human brain imaging data sets that were available on the UCLA computer cluster. To facilitate access, Dr. ████ maintained a formal relationship with UCLA. Several other faculty members at UCF maintain similar affiliations outside the university to facilitate research, mentorship, and collaborations. This is a common practice in academia, particularly in fields such as neuroscience and astrophysics that require access to large research equipment (e.g., telescopes, MRI machines) that may not be available at their home universities.

I served on the curriculum committee with Dr. ████, and then began running these meetings when I served as Interim Director of Graduate Programs in SMST, after Dr. Paul Weigand left UCF. I retained this position until the Fall of 2022. During one of these meetings, we discussed Dr. ████'s initial request to buy out of teaching, using her startup and grant funds. This was approved, releasing her from teaching duties. At a subsequent meeting in 2021, after reviewing the annual budget with our accountant, it became clear that cuts would be necessary, unless Dr. ████ bought out of teaching again. Dr. ████ volunteered to use her startup funds to buy out of teaching a second time.

During her approved release time, Dr. ████ often traveled to deliver lectures at prestigious universities and scientific meetings. She was also very productive writing and publishing research papers on her own and with her students and colleagues, in part because of this time without teaching responsibilities.

Sincerely,

Charles E. Hughes
  Pegasus Professor, Computer Science
    Secondary Appointments in ECE, SMST, Education, and Games & Interactive Media
  Co-Lead and Co-Founder, Learning Sciences Cluster
  Co-Director, Synthetic Reality Laboratory
E-Mail: Charles.Hughes@ucf.edu
Home page: http://www.cs.ucf.edu/~ceh

R. Paul Wiegand
Rock Hill, SC

May 3, 2023

To whom it may concern,

This letter is in regards to Dr. ███████████ her academic duties, and her appointment in the School of Modeling, Simulation, and Training (SMST) at the University of Central Florida (UCF). I first met Dr. ██████ when she joined the faculty at UCF as an assistant professor in the Fall of 2016. Her appointment was for a 9 month assistant professor faculty position at UCF. At that time I was on the research faculty with both teaching and research assignments within the school.

As a part of her teaching assignments, Dr. ███████ was given core, required courses of the Modeling & Simulation (M&S) graduate programs to teach (e.g., *IDS 6262 – Research Design for Modeling and Simulation*). Because of this and her tenure-track appointment to the school, she joined the M&S curriculum committee as a part of her service duties. That committee met weekly during the academic year, and in the 2016–2017 academic year she participated regularly in these meetings. Subsequently, Dr. ████████ research obligations increased. She won several grants, published a number of notable papers, and as a result of the natural process of disseminating her work, her travel schedule increased. She participated in curriculum committee meetings, subject to that travel schedule. UCF is a research-forward university, and the culture at UCF values research obligations above service obligations.

In the Fall of 2018, I became the interim director of the M&S graduate programs. In this capacity, I chaired the curriculum committee (among other things), and I was responsible for programatic and administrative obligations with respect to the courses and students in those programs. Though I had no supervisory role over Dr. ██████, I worked with Dr. Shumaker regarding the *teaching* duties of faculty involved in the program.

A common practice among research-active faculty at UCF is to use grant money to offset teaching costs so that a faculty member can shift their assignments to lighten teaching duties in favor of research duties (a so-called "*buy-out*"). I was aware that Dr. Shumaker and Dr. ███████ made such an arrangement. Starting in 2018, Dr. ████ "bought out" of some of her teaching duties to focus on her research. The M&S graduate programs involve both non-tenure track research faculty who are paid by contracts and grants, as well as tenure-track faculty like Dr. ████████. Buy outs from tenure-track faculty were often helpful for the M&S program because it provided funding for research faculty who wanted to teach to be able to do so.

During that time period, I was also a committee member for one of Dr. ███████ doctoral students, ██████████, and I helped facilitate discussions between Dr. ███████ and her student. As a part of those discussions, I was aware that Dr. ████████ brought ████████████ to join her at UCLA one Summer to learn about MRI imaging in order to train ███ in techniques that she needed to complete her dissertation research. I was unaware of the specific details of Dr. ████████ relationship with UCLA; however, it is not unusual for faculty members to have both formal and informal affiliations with other institutions as a part of the process of collaborative research. For example, though I now on the faculty at Winthrop University, I currently hold a courtesy appointment with UCF.

Sincerely,

*[signature]*

Dr. R. Paul Wiegand

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT B


University of
**Central
Florida**

# IST Travel Request Form

Please forward completed travel request form with approval from supervisor to:
Mirth St. Juste, – mstjuste@ist.ucf.edu (407-882-1311)
Note: As required by Florida Statute 112.061, the department must provide
<u>documentation that the supervisor has approved this trip in advance</u>.

**Name of Traveler (including middle name) as on government ID:**


**Birthday of Traveler (if airline reservation is needed):**


**Employee/Student ID number:**  PID - 2926773

**Email:** @knights.ucf.edu

**\*Account Code:**
-With supervisor's approval attached-

**Date of Departure:** 06/30/2017 (departing from Vancouver Canada)

**Date of Return**: 07/30/2017 (returning to Orlando, FL)

**Destination:** Los Angeles, California

**Purpose of trip:** Research initiatives with advisor, Dr. ⬛

**\*Benefit to Project (benefit to state if on overhead account):** The benefits to this
project are in research initiatives – data collection using neuroimaging technology
(structural/functional MRI and DTI) at the UCLA campus. Formation of networking
opportunities and campus ties to UCLA.

**\*Conference Registration needed:**  Yes  <u>**No-Booked by traveler**</u>

**\*Airlines Reservation Needed: <u>Yes</u>**   No-Booked by traveler
      **Seating Preference**: <u>**Window**</u>   Aisle
      (Please attach preferred flight schedule)

**\*Hotel Reservation Needed: <u>Yes</u>**  No-Booked by traveler
(Please provide preferred hotel)

**Will credit card authorization be need for hotel:** Yes No



**\*Car Rental Needed:**   Yes   **<u>No</u>**

**Please leave a comment for any additional information:**



# IST Travel Request Form

Please forward completed travel request form with approval from supervisor to:
Mirth St. Juste, – mstjuste@ist.ucf.edu (407-882-1311)
Note: As required by Florida Statute 112.061, the department must provide
<u>documentation that the supervisor has approved this trip in advance</u>.

**Name of Traveler  including middle name) as on government ID:**

█████████████

**Birthday of Traveler (if airline reservation is needed):**

████████

**Employee/Student ID number:**  PID - 2926773

**Email:** ███████@knights.ucf.edu

**\*Account Code:**
**-**With supervisor's approval attached-

**Date of Departure:** 06/25/2017

**Date of Return**:  N/A or 06/30/2017 (I will be departing from Vancouver, Canada to Los
Angeles, California. See additional information)

**Destination:** Vancouver, BC, Canada

**Purpose of trip:** OHBM conference

**\*Benefit to Project (benefit to state if on overhead account):** Student will be
presenting a poster related to her thesis/dissertation. This will enhance her oral
presentation skills, networking connections, and research initiatives.

**\*Conference Registration needed:**   Yes   <u>**No-Booked by traveler**</u>

**\*Airlines Reservation Needed: <u>Yes</u>**    No-Booked by traveler
         **Seating Preference**: Window    <u>**Aisle**</u>
         (Please attach preferred flight schedule)

**\*Hotel Reservation Needed: <u>Yes</u>**  No-Booked by traveler
(Please provide preferred hotel)

**Will credit card authorization be need for hotel:** Yes No



**\*Car Rental Needed:**   Yes **<u>No</u>**

**Please leave a comment for any additional information:**

Return trip will be from Vancouver, Canada to Los Angeles, California. The California
trip is also a required travel trip that will be filled in a different travel form.

1
2
3
4
5
6
7
8
9
10
11                                    EXHIBIT C
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Re: Remote work request

███████mith <Eileen.Smith@ucf.edu>
Wed 8/4/2021 5:55 PM
To: ██████████████████ @ist.ucf.edu>
█████████

The meeting is in person, and I'm sending an update out to folks with the location and agenda most likely tomorrow morning. Spoiler alert: it's happening in P3….

Thanks!
Eileen

**From:** ████████████ ████████ ist.ucf.edu>
**Date:**   e nes  ay,   ugust 4, 2021 at 3:14 PM
**To:** Eileen Smith <Eileen.Smith@ucf.edu>
**Subject:** Re: Remote work request

Hi Eileen,

I would be thrilled to be there at the strategic planning meetings.  I was not aware of them.  I guess I missed the email somehow. Is the meeting on in person, online or both?

I am currently off-site working on data collection before the start of teaching, but I can be there.

best
████████

**From:** Eileen Smith <Eileen.Smith@ucf.edu>
**Sent:** Wednesday, August 4, 2021 3:02 PM
**To:** ███████████████ ist.ucf.edu>
**Su  ect:**  e:  emote wor  request

Thanks, ███████!
Question for you: are you able to join the Strategic Planning sessions next Tuesday and Wednesday? An invite went out a week or so ago, and I'm tracking down folks who haven't gotten the chance to reply.

Let me know; we would love to have you around the tables!

Eileen

**From:** ██████████████████ @ist.ucf.edu>
**Date:**   e nes  ay,   ugus  ,    at 2:59 PM
**To:** Smith, Eileen <esmith@ist.ucf.edu>
**Subject:** Re: Remote work request

Dear Eileen,

Sounds great.  Attached is the updated form.

best,
████████

**From:** Smith, Eileen <esmith@ist.ucf.edu>
**Sent:** Tuesday, August 3, 2021 9:50 PM
**To:** ██████████████████ @ist.ucf.edu>

Cc: ████████████████@ucf.edu>; Ramirez, Nayade <nramirez@ist.ucf.edu>
**Subject:** Re: Remote work request

I am ████████ f the migration myself. Totally understand. You should put normal hours. Research colle ████████ activities like you describe are project specific and temporary.

Thanks for reaching out! I look forward to your form.

Eileen

Sent from my iPhone

> On Aug 3, 2021, at 7:40 PM, ████████████████@ist.ucf.edu> wrote:
>
> Hi Eileen,
>
> Apolgies for the delay while working on my IST mail migration!
>
> I tried calling you a few times.  I wasn't sure what to put in the hours because as explained in my attachment - I will be remote working for clusters of time because I need to perform data collection off-site where they have the equipment.
>
> Should I just fill in regular hours?
>
> Feel free to give me a ring on my cell: 310-409-6130
>
> best,
>
> ████████
>
> _____
>
> **From:** Smith, Eileen <esmith@ist.ucf.edu>
> **Sent:** Friday, July 30, 2021 11:47 AM
> **To:** ████████████████@ist.ucf.edu>
> **Cc:** Ramirez, Nayade <nramirez@ist.ucf.edu>
> **Subject:** FW: Remote work request
>
> ████████-
> If you would please fill out the chart inside the form that looks at hours/day, that would be appreciated.
> Thanks!
> Eileen
>
> **From:** ████████████████@ist.ucf.edu>
> **Date:** Wednesday, July 28, 2021 at 8:35 AM
> **To:** Smith, Eileen <esmith@ist.ucf.edu>
> **Subject:** Remote work request
>
> Dear Eileen,
>
> I have a reqest form for remote work because I will periodically be collecting data off-site.  Many apologies for the delay because I was tirelessly working on my NSF CAREER award that was submitted on Monday.

I'm attaching the form and explanation here. Please let me know if you need anything else.

With best wishes,

**UCF** | **Human Resources**
UNIVERSITY OF CENTRAL FLORIDA

## Remote Work Arrangement Request

| Section I – Employee Information |
|---|

☐ NEW remote work arrangement request    ☐ Renewal or extension request
☐ Change request    ☐ Terminate participation

**Employee Name:** ▓▓▓▓▓▓▓▓▓▓

| Employee ID: PA073824 | **Employee Classification:** |
|---|---|
| Division/College: IST | ☐ A&P    ☐ USPS |
| Department: SMST | ☐ Faculty    ☐ Other |

**Current Position Title:** Assistant Professor

**Central Workplace:** Partnership 2

**Duration** (*maximum one year*):
Begin Date _____7/26/21_____    End Date _____    **Periodically off-site for multimodal neuroimaging and brain stimulation data collection (see attached)**

**Remote Workplace:** Center for Cognitive Neuroscience, Laureate Institute for Brain Research

**Supervisor Name:** Charlie Hughes

| Proposed Remote Work Schedule | | | |
|---|---|---|---|
| **Day** | **Hours at Central Workplace** | **Hours at Remote Workplace** | **Total Hours** |
| Monday | 8 | | 8 |
| Tuesday | 8 | | 8 |
| Wednesday | 8 | | 8 |
| Thursday | 8 | | 8 |
| Friday | 8 | | 8 |
| Saturday | | | |
| Sunday | | | |

| Section II - Supervisor Survey | Y/N |
|---|---|
| Job duties can be performed fully or partially remotely. | ☐ Yes ☐ No |
| Supervisor has discussed with the employee what job duties are to be performed remotely and planned for any duties that must be performed on site. | ☐ Yes ☐ No |
| Employee has appropriate remote space, equipment, telephone, and internet access. | ☐ Yes ☐ No |
| Employee can ensure that remote work will not create an information security risk. | ☐ Yes ☐ No |
| Employee has demonstrated basic necessary job performance. | ☐ Yes ☐ No |
| Supervisor can provide adequate supervision and accountability for the remote work. | ☐ Yes ☐ No |

_____    _____
Supervisor Signature    Date

| Section III - Safety Checklist<br>*The following safety features must be verified by employee at remote workplace listed above:* | Y/N |
|---|---|
| Temperature, ventilation, lighting, and noise levels are adequate for maintaining a work location. | ☐ Yes  ☐ No |
| Electrical equipment is free of recognized hazards that could cause physical harm and electrical system allows for grounding of electrical equipment. | ☐ Yes  ☐ No |
| Remote workplace is free of any obstructions that could restrict visibility and movement. | ☐ Yes  ☐ No |

## Additional Terms of Remote Work Arrangement

### Security of Data
The employee will apply approved safeguards to protect UCF data from unauthorized disclosure or damage and will comply with UCF Policy 2-100.3, *Florida Public Records Act – Scope and Compliance*. Work performed at the remote workplace is considered official UCF business. All records, papers, and correspondence must be safeguarded for their return to the official location. Release or destruction of any records should only be done at the central workplace according to statute and regulation. Computerized files are considered official records and shall be similarly protected. See UCF Policy, 4-008, *Data Classification and Protection*.

### Liability
UCF will not be liable for damage to the employee's property or changes in taxation requirements that results from participation in the UCF Remote Work Arrangement Program.

### Curtailment of the Arrangement
The employee may terminate participation in the Remote Work Arrangement Program. The university reserves the right to terminate or adjust this Remote Work Arrangement or workplace schedule at any time. The employee agrees to limit performance of officially assigned duties to the official work location or to the UCF approved remote work location. Failure to comply with this provision may result in termination of the Remote Work Arrangement and/or other appropriate disciplinary action.

## Employee Acknowledgement
I request approval to participate in the UCF Remote Work Arrangement Program and agree to adhere to all applicable program guidelines and policies. **I acknowledge that I have read, understand, and agree to abide by this Remote Work Arrangement, the UCF Remote Work Arrangement Program Manual, and UCF Policy EP-20-6,** *Remote Work Arrangements*.

_____     7/26/21
Employee Signature                                         Date

## Approval

_____     _____
Dean, Director, Department Head, or Designee Signature          Date

| For Exceptions Only |
|---|
| _____      _____<br>Provost or Vice President                          Date |

Signatures may be written or provided electronically.

Please forward the completed form to the Human Resources Leave of Absence Section for final review and processing via email (loaandworkcomp@ucf.edu) or secure eFax (407-882-9023). Changes or discontinuation of the arrangement must also be submitted to Human Resources.

I am extremely grateful to be funded currently by an AFOSR grant (#FA9550-18-S-0003) via the Cognitive and Computational Neuroscience program.  In my many years of neuroscience research, this is the most excited that I have ever been about any research project.  Here is a brief summary of the project:

Human EEG has existed for 96 years now, and is now considered an indispensable tool for measuring brain activity data for both research and clinical applications.  However, EEG is measured at the scalp, and determining the spatial location of the neural generators of the EEG signal is a very challenging problem mathematically (because it is ill-posed) and mostly because we lack a comprehensive model of how neurons synchronize (or desynchronize) to collectively create voltage fluctuations of sufficient magnitude to be measured at the scalp.  All current models assume that EEG is measuring voltage fluctuations from gray matter, where the bodies of the neurons (or somas) are localized.  Contributions from white matter are considered negligible because they are thought to be too fast to superimpose temporally. However, I have never personally been satisfied with this account of the neural generators of EEG signals because 10^7 neurons must fire and synapse on a given dendritic tree that must also be aligned orthogonal to the scalp in order to produce measurable voltage deflections.  The signal traveling along white matter is significantly larger in magnitude. I began working on a computational model of white matter contributions to EEG signaling in 2018.  I was astounded how few parameters were available in the literature related to simple aspects of neuroanatomy.  In early 2019, I was lucky enough to be invited to speak at the Max Planck Biocybernetics unit.  On my visit, I told I could make use of the visitors office, which was former office of the late Valentino Braitenberg, a famous neuroanatomist, while visiting.  Surprisingly, I found all the parameters that I needed in his old micrographs within his office, in old papers that were never scanned in and uploaded to the internet.

My project with AFOSR has two parts.  The first is expanding my mathematical model which explores white matter contributions to EEG signals from a theoretical, modeling and simulation perspective.  This model, called the white matter latency (WML) model, was published in early form (Douglas 2019), and has now been expanded to include a synchrony phenomenon known as ephaptic coupling.  I am currently working on embedding this model within a finite element model to expand my predictions from the time-frequency domain to the spatial domain, essentially making the model 4-d (x,y,z, time). The second portion requires data to adjudicate between competing models.  The data itself are multimodal:  diffusion MRI to measure the architecture of white matter, transcranial ultrasound (TUS) to disrupt neuronal signaling along white matter, and a subsequent arterial spin labeling (ASL) MRI scan to confirm that the acoustic focus indeed interacted with the target brain location as expected.

The experimental portion of the project is currently in progress.  It requires the following equipment:

• A 3 Tesla MRI scanner, ideally equipped with a head coil capable of multi-band
  scanning, but at least one capable of diffusion weighted imaging for high resolution
  multi-angle imaging of white matter morphology
• A neuronavigation system
• A transcranial ultrasound (TUS) system for low intensity focused ultrasound pulsation
• A high density EEG system (with sufficient electrode coverage to perform EEG
  analysis in the source domain, meaning at least 100 electrodes)

The TUS device itself is entirely new technology, approved for human use only recently
by the FDA.  Only a few sites around the world currently have such a device.  It is worth
mentioning that the TUS technology is currently taking the neuroscience community by
storm.  In 2019, there were only 14 published articles in the extant literature on TUS in
humans.  There are now more publications and growing evidence that TUS can be used
to treat Alzheimer's disease, stroke, a variety of ischemic events, anxiety, and I have
personally watched someone be awakened from a vegetative state (coma) after TUS
sonication.

At the present moment, I have made arrangements with two such facilities to carry out
the experimental portion of the project at the CCN and at LIBR.  Given that this is my
project, and that we are still in the process of tuning the TUS parameters (particularly for
targeting white matter), it is imperative that I be at these collaborative sites to collect
these data, and optimize the sonication parameters alongside the experimental
protocols.

In the past 8 months, I have submitted numerous grant applications to purchase a TUS
system, a neuronavigation system, and a high density EEG amplifier and nets.  I have
worked specifically with Magstim, the only company that I know of that makes 256
electrode EEG nets to design a system specifically for this project.  I have also worked
closely with materials engineers and ultrasound engineers at Brainsonix to design
ultrasound transducers capable of targeting the brain regions required for this grant.

I currently have a DURIP under review with AFOSR to purchase the aforementioned
systems that are needed to carry out this work (~300k).  I am very hopeful that the
DURIP will be funded so that I can set up the TUS project locally.  Additionally, I have
submitted 2 NSF proposals (CAREER, CRCNS) and a MURI with the Army Research
Lab that have requested these equipment within the budget. I am also planning to
submit an EAGER award amongst other proposals in the coming months.

In the meantime, I need to periodically work off-site to collect these data.  I am also in
the middle of data collection, and I am hoping to get as much data as possible prior to
the AFOSR CCN annual meeting, when it will likely be determined whether I receive
additional years of funding via this mechanism.

Thankfully, I have been able to perform all duties remotely during the past year due to
the pandemic from attending meetings and lectures at IST, to grant submissions, to
teaching, where I received my highest marks as an educator thus far.  I anticipate

working on site in the beautiful Partnership 2 building as much as possible in the fall.  I
respectfully request to work remotely during the times which I will need to be off-site for
data collection.  Thank you very much for your time in considering this request.

1

2

3

4

5

6

7

8

9

10

11                                    EXHIBIT D

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**From:**      Gabrielle Russon
**To:**        Mark Schlueb
**Subject:**   ⨉⨉⨉⨉⨉ story
**Date:**      Monday, January 16, 2023 8:01:12 AM

Hi Mark,

I'm going to file my story for Florida Politics on ⨉⨉⨉⨉⨉⨉ Thursday afternoon.

Two things.

1. There were lots of red flags about her misconduct and her dual jobs.

I noticed that she listed both her employers – UCF and UCLA – in some of her published articles, like one that was published in 2018 in a medical science journal and could be read online. So there's one clue out in the open.

UCF warned her about using her personal email to conduct school business in 2019 but she kept doing it anyway.

Then "In an email dated November 4, 2020 the interim director asked Dr. ⨉⨉⨉⨉whether she had a dual appointment with UCLA." The director told her to document it to prevent concerns and didn't take any further action when she didn't even answer his basic questions in an email.

Why did the school wait until the anonymous IntegrityLine complaint in 2021 to formally investigate her? That means she's still getting paid all this time. It seems like she could have been found out much earlier since she was so brazen about this. Let me know if UCF wants to comment on this point and anything else as well. Happy to include any statements you would like to make. I'm going to bring up these red flags in my story as well, to be clear.

2. Can I also get a copy of her UCF photo and her resume?

Thank you.
Gabrielle

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT E

**From:** **Chad Binette** MAILER-DAEMON
**Subject:** RE: update
**Date:** January 19, 2023 at 11:58 AM
**To:** Gabrielle Russon ▨▨▨▨▨▨▨▨▨▨▨

CB

Yes, if we receive them.

---

**From:** Gabrielle Russon <gabriellerusson@gmail.com>
**Sent:** Thursday, January 19, 2023 2:53 PM
**To:** Chad Binette <Chad.Binette@ucf.edu>
**Subject:** Re: update

Thanks Chad.

Are you going to get back to me today on her résumé, her mug shot and the written response she gave it to her termination letter?

On Thu, Jan 19, 2023 at 2:50 PM Chad Binette <Chad.Binette@ucf.edu> wrote:

> Gabrielle,
>
> Thank you! Here you go …
>
> We disagree with the conclusion you are attempting to make here. As stated in the report, "Dr. ▨▨▨▨ actions identified during the investigation demonstrate that she took deliberate actions to purposely deceive UCF," including describing her position with UCLA as "an honorary type of research staff position." It became clear during the investigation that Dr. ▨▨▨ was dually employed and compensated and in violation of numerous university policies and federal sponsor requirements, and the university proceeded with termination.
>
> Chad

---

**From:** Gabrielle Russon <gabriellerusson@gmail.com>
**Sent:** Thursday, January 19, 2023 12:28 PM
**To:** Chad Binette <Chad.Binette@ucf.edu>
**Subject:** Re: update

Thanks, Chad.
I appreciate it.
I'm finishing my story the end of day so you have plenty of time. I will not submit anything to my editor today until I hear from you.

On Thu, Jan 19, 2023 at 12:23 PM Chad Binette <Chad.Binette@ucf.edu> wrote:

> Hi Gabrielle,
>
> I will have a statement to you in about an hour.
>
> Chad

Chad Binette
Assistant Vice President
UCF Communications

Cell: 407-247-8777
Breaking News: 407-823-5300

***We unleash the potential of people and ideas to positively impact the world.***

Building A University *for* the Future

Please note: Florida has a very broad open records law (F. S. 119). E-mails may be subject to public disclosure.

1
2
3
4
5
6
7
8
9
10
11                                    EXHIBIT F
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**From:** **Chad Binette** MAILER-DAEMON
**Subject:** RE: Florida Politics story on ✕✕✕✕✕✕
**Date:** January 19, 2023 at 10:46 AM
**To:** Mike Kilbride Mike.Kilbride@ucf.edu, Michael Johnson Michael.Johnson@ucf.edu, Rhonda Bishop Rhonda.Bishop@ucf.edu, Janet Owen Janet.Owen@ucf.edu, Jana Jasinski Jana.Jasinski@ucf.edu, Youndy Cook Youndy.Cook@ucf.edu
**Cc:** Patrick Burt Patrick.Burt@ucf.edu

CB

Updated … We disagree with the conclusion you are attempting to make here. As stated in the report, "Dr. ✕✕✕✕ actions identified during the investigation demonstrate that she took deliberate actions to purposely deceive UCF," including describing her position with UCLA as "an honorary type of research staff position." It became clear during the investigation that Dr. ✕✕✕✕ was dually employed and compensated and in violation of numerous university policies and federal sponsor requirements, and the university proceeded with termination.

---

**From:** Chad Binette
**Sent:** Thursday, January 19, 2023 1:32 PM
**To:** Mike Kilbride <Mike.Kilbride@ucf.edu>; Michael Johnson <Michael.Johnson@ucf.edu>; Rhonda Bishop <Rhonda.Bishop@ucf.edu>; Janet Owen <Janet.Owen@ucf.edu>; Jana Jasinski <Jana.Jasinski@ucf.edu>; Youndy Cook <Youndy.Cook@ucf.edu>
**Cc:** Patrick Burt <Patrick.Burt@ucf.edu>
**Subject:** RE: Florida Politics story on ✕✕✕✕✕✕

Mike and Rhonda,

What do you think of this? Courtney and I both worked on it – we were trying to make it more quotable and tighten it up a little. We also read the reference to what the honorary position allowed to include both access to equipment and also serving on thesis committees, so we pulled that piece out.

We disagree with the conclusion you are attempting to make here. As stated in the report, "Dr. ▬▬▬ actions identified during the investigation demonstrate that she took deliberate actions to purposely deceive UCF," including describing her position with UCLA as "an honorary type of research staff position." It became clear during the investigation that Dr. ✕✕✕✕ was in violation of numerous university policies and federal sponsor requirements, and the university proceeded with termination.

Chad

---

**From:** Mike Kilbride <Mike.Kilbride@ucf.edu>
**Sent:** Thursday, January 19, 2023 12:56 PM
**To:** Chad Binette <Chad.Binette@ucf.edu>; Michael Johnson <Michael.Johnson@ucf.edu>; Rhonda Bishop <Rhonda.Bishop@ucf.edu>; Janet Owen <Janet.Owen@ucf.edu>; Jana Jasinski <Jana.Jasinski@ucf.edu>; Youndy Cook <Youndy.Cook@ucf.edu>
**Cc:** Patrick Burt <Patrick.Burt@ucf.edu>
**Subject:** Re: Florida Politics story on ✕✕✕✕✕✕

Chad, some tweaks below from me and Rhonda. – Please give this a pass from your perspective.
Mike

---

We disagree with the conclusion you are attempting to make here. As stated in the report, "Dr. ✖✖✖✖ actions identified during the investigation demonstrate that she took deliberate actions to purposely deceive UCF." This purposeful deception included how the relationship with her former employer was originally described, an example of which is shared on Page 5 of the report where Dr. ✖✖✖✖ described her role in late 2020 as an "honorary type of research staff position" that was only granted to access resources required to serve on thesis committees. It became clear during the investigation that Dr. ✖✖✖✖ was dually employed, and the university proceeded with termination, which is also outlined in the documents you have requested.

---

**From:** Chad Binette <Chad.Binette@ucf.edu>
**Date:** Tuesday, January 17, 2023 at 3:23 PM
**To:** Mike Kilbride <Mike.Kilbride@ucf.edu>, Michael Johnson <Michael.Johnson@ucf.edu>, Rhonda Bishop <Rhonda.Bishop@ucf.edu>, Janet Owen <Janet.Owen@ucf.edu>, Jana Jasinski <Jana.Jasinski@ucf.edu>, Youndy Cook <Youndy.Cook@ucf.edu>
**Cc:** Patrick Burt <Patrick.Burt@ucf.edu>
**Subject:** RE: Florida Politics story on ✖✖✖✖✖✖✖

Mike,

She said she is filing her story Thursday, so ideally by the end of the day tomorrow.

Chad

---

**From:** Mike Kilbride <Mike.Kilbride@ucf.edu>
**Sent:** Tuesday, January 17, 2023 3:21 PM
**To:** Chad Binette <Chad.Binette@ucf.edu>; Michael Johnson <Michael.Johnson@ucf.edu>; Rhonda Bishop <Rhonda.Bishop@ucf.edu>; Janet Owen <Janet.Owen@ucf.edu>; Jana Jasinski <Jana.Jasinski@ucf.edu>; Youndy Cook <Youndy.Cook@ucf.edu>
**Cc:** Patrick Burt <Patrick.Burt@ucf.edu>
**Subject:** Re: Florida Politics story on ✖✖✖✖✖✖✖

Chad,

I just spoke with Rhonda because I had some follow up questions after re-reading the report. She is looping back with her team.

When do we need to have a statement back to Gabrielle?

Mike

—

**Michael A. Kilbride**
*Executive Chief of Staff*

Office of the President

Office of the President
University of Central Florida

[Building A University *for* the Future](#)

---

**From:** Chad Binette <[Chad.Binette@ucf.edu](mailto:Chad.Binette@ucf.edu)>
**Date:** Tuesday, January 17, 2023 at 11:35 AM
**To:** Mike Kilbride <[Mike.Kilbride@ucf.edu](mailto:Mike.Kilbride@ucf.edu)>, Michael Johnson <[Michael.Johnson@ucf.edu](mailto:Michael.Johnson@ucf.edu)>, Rhonda Bishop <[Rhonda.Bishop@ucf.edu](mailto:Rhonda.Bishop@ucf.edu)>, Janet Owen <[Janet.Owen@ucf.edu](mailto:Janet.Owen@ucf.edu)>, Jana Jasinski <[Jana.Jasinski@ucf.edu](mailto:Jana.Jasinski@ucf.edu)>, Youndy Cook <[Youndy.Cook@ucf.edu](mailto:Youndy.Cook@ucf.edu)>
**Cc:** Patrick Burt <[Patrick.Burt@ucf.edu](mailto:Patrick.Burt@ucf.edu)>
**Subject:** RE: Florida Politics story on ⬛⬛⬛⬛⬛⬛⬛

All,

The termination letter that was requested is attached. I also added Youndy to the chain.

Chad

-----Original Message-----
From: Chad Binette
Sent: Tuesday, January 17, 2023 10:09 AM
To: Mike Kilbride <[Mike.Kilbride@ucf.edu](mailto:Mike.Kilbride@ucf.edu)>; Michael Johnson <[Michael.Johnson@ucf.edu](mailto:Michael.Johnson@ucf.edu)>; Rhonda Bishop <[Rhonda.Bishop@ucf.edu](mailto:Rhonda.Bishop@ucf.edu)>; Janet Owen <[Janet.Owen@ucf.edu](mailto:Janet.Owen@ucf.edu)>; Jana Jasinski <[Jana.Jasinski@ucf.edu](mailto:Jana.Jasinski@ucf.edu)>
Cc: Patrick Burt <[Patrick.Burt@ucf.edu](mailto:Patrick.Burt@ucf.edu)>
Subject: Florida Politics story on ⬛⬛⬛⬛⬛⬛⬛

Good morning,

Gabrielle Russon plans to publish her Florida Politics story on ⬛⬛⬛⬛⬛⬛⬛ - the former IST professor who was dually employed by UCLA -- on Thursday. To keep you updated, she has requested the documents below and also has sent additional questions that we can choose to respond to if we wish. Her questions and comments are below. Please advise, or let me know if you would like for me to set up a short meeting for today or tomorrow. I have updated Grace on this request, and I will continue to update her.

Thanks,

Chad

Can I get a copy of her UCF photo and her resume? (WE WILL GET THE RESUME FROM HR)

Can I get a copy of her termination letter? (WE WILL GET THIS FROM HR)

Do you know who the unnamed interim director is who was mentioned in this report who asked her about her UCLA job in 2020 or the prior unnamed directors who allegedly gave

 approval when she was first hired?

There were lots of red flags about her misconduct and her dual jobs.

I noticed that she listed both her employers – UCF and UCLA – in some of her published articles, like one that was published in 2018 in a medical science journal and could be read online. So there's one clue out in the open.

UCF warned her about using her personal email to conduct school business in 2019 but she kept doing it anyway.

Then "In an email dated November 4, 2020 the interim director asked Dr. ██████ whether she had a dual appointment with UCLA." The director told her to document it to prevent concerns and didn't take any further action when she didn't even answer his basic questions in an email.

Why did the school wait until the anonymous IntegrityLine complaint in 2021 to formally investigate her? That means she's still getting paid all this time. It seems like she could have been found out much earlier since she was so brazen about this. Let me know if UCF wants to comment on this point and anything else as well. Happy to include any statements you would like to make. I'm going to bring up these red flags in my story as well, to be clear.

1
2
3
4
5
6
7
8
9
10
11                                            EXHIBIT G
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**From:** **Stephanie Bechara** Stephanie.Bechara@ucf.edu
**Subject:** AM DRAFT: UCF News Clips - Monday, January 23, 2023
**Date:** January 23, 2023 at 4:05 AM
**To:** Chad Binette  Chad.Binette@ucf.edu



Added it in there! Thank you.

**Stephanie Bechara**
Communications Specialist
**University of Central Florida**
12443 Research Parkway, Suite 301, Orlando, FL 32826

📞 Office: 407-823-1044
📱 Text: 786-333-1193
☎ & # - 4  9  7 ; After-Hours Media Line: 407-823-5300
📧 : Stephanie.Bechara@ucf.edu
**UCF Today** | **Pegasus** | **ucf.edu**

---

**From:** Stephanie Bechara <noreply@muckrack.com>
**Date:** Monday, January 23, 2023 at 7:03 AM
**To:** Stephanie Bechara <Stephanie.Bechara@ucf.edu>
**Subject:** UCF News Clips - Monday, January 23, 2023

The UCF News Clips shares stories, both positive and negative, related to UCF coverage in the media. These clips are for your awareness and cover various topics, including significant higher education issues. If you have questions, please contact Chad Binette at chad.binette@ucf.edu

# UCF News

## UCF medievalist receives $60K research award for book

WFTV-TV (Orlando, FL) | 774,787 unique visitors per month

The National Endowment for the Humanities recently selected a University of Central Florida assistant professor for a highly competitive research award. The university said Stephen Hopkins received a $60,000 fellowship for his book, "The Infernal Laboratory: Vernacular Theology and Hell in the Medieval North Sea." Hopkins said the book explores the concept of the afterlife in texts during the Middle Ages. Hopkins focuses on English subjects but also teaches linguistics, early medieval literature and mythology, UCF said. According to the NEH website, Hopkins is one of 70 NEH fellowship recipients, with a total of $3.9 million granted overall.

Tweet  Share on LinkedIn

## Buddy Pittman, famed Central Florida sportscaster who covered NASCAR, is stepping down from on-air role.

Orlando Sentinel | 1,886,167 unique visitors per month

The roar of engines was no longer echoing throughout the Daytona International Speedway

The roar of engines was no longer echoing throughout the Daytona International Speedway, another thrilling Daytona 500 had ended just a few hours earlier, and I was moments from delivering a live TV report from the quiet of pit road at that hallowed venue. Save for a smattering of TV crews preparing live shots back to their respective stations, there were few of us left in the area. Buddy Pittman's 50-year career in television ended this week with his retirement from WUCF, the University of Central Florida's public TV station. It was a remarkable run, most of it spent here in central Florida, where Buddy became an icon at WESH. Some of us are born without talent. Buddy was born without an ego. He was a director, a producer, a terrific sportscaster. Once a news photographer. The film from the still-infamous, grisly Ziegler Winter Garden furniture store murder scene in 1975? The camera was on Buddy's shoulder that night. To the very day of his retirement, he schlepped a camera around the state for WUCF, one-man-banding his way through brilliant interviews, then shooting his own cover video before editing the stories himself. Buddy turns 71 in May. Still no ego.

<u>Tweet</u> <u>Share on LinkedIn</u>

## Ghosted: Double life of UCF professor unravels

Florida Politics | 419,094 unique visitors per month

██████████ led a double life for nearly six years. The UCF assistant professor secretly held a second full-time career at UCLA on the opposite coast while she worked in Orlando, according to a school report released to Florida Politics this month in a public records request. Her career finally unraveled in 2022. UCF got an anonymous complaint about ████ in November 2021 and launched an investigation that found she broke multiple rules and had a history of missing class, meetings and other obligations in Orlando. UCF fired Douglas from her $113,651-a-year job, and her last day was Nov. 1, school spokesperson Mark Schlueb said. She was seeking tenure when she lost her job at UCF's high-tech School of Modeling, Simulation and Training. ████ is also no longer employed at UCLA, said school spokesperson Steve Montiel, who declined to provide more details. Florida Politics asked if UCF had missed plenty of red flags over the years as ████ was a ghost on campus and UCF did not monitor her when she kept breaking the email policy or, as her boss suspected in 2020, she had a second career at UCLA. UCF spokesperson Chad Binette defended how the university handled the situation and blamed Douglas for being deceptive.

Similar story:
The College Fix | <u>Professor secretly held two full-time jobs on opposite coasts</u>
<u>Tweet</u> <u>Share on LinkedIn</u>

## UCF player dismissed from team after home invasion arrest

Associated Press | 29,505,835 unique visitors per month

University of Central Florida defensive back Justin Hodges has been dismissed from the team following his arrest on a charge of home invasion robbery with a firearm and a mask. The UCF athletic department said in a statement on Friday that Hodges had been let go from the football program and that the university had initiated a review of his conduct. Orange County Jail records show that Hodges was booked by the Orlando Police Department on Thursday on the first-degree felony charge. According to a police statement, a victim told police officers that several men, including Hodges, battered him last week after barging into his apartment in downtown Orlando. They threatened him with their guns "in an extremely violent manner" and stole his phone and recording equipment, according to the police.

Similar stories:
NBC 2 | <u>UCF football player arrested for armed home invasion in Orlando</u>
News 13 | <u>UCF football player arrested after Orlando home invasion</u>

News 13 | UCF football player arrested after Orlando home invasion
Fox 35 | UCF football player, woman arrested in violent home invasion at downtown Orlando high-rise, police say

Tweet Share on LinkedIn

## We need more education in schools on racial issues - not bans

Washington Post Opinions | 62,643,435 unique visitors per month

You shouldn't have to live in a blue state to learn or teach America's racial history in an honest way. But that's where America seems to be heading — a particularly terrible outcome if, like me, you live in a red state. It was bad enough when essentially every Republican-dominated state passed laws restricting how racial issues were discussed at the K-12 level. (There has been a separate and equally problematic series of restrictions on books about LGBTQ issues.) Books written by or about luminaries such as Toni Morrison and Rosa Parks are being kept out of school libraries, either because conservative parents objected or officials are worried that they will. Teachers in red states are now leery of saying anything about racial issues that conservatives don't like — and a few have been removed from their jobs. Now, Republican officials, particularly in Florida, are going further, seeking to limit colleges from teaching critical race theory and other ideas on race that conservatives oppose. The University of Central Florida, wary of offending the state's Republican leaders, isn't offering any courses that primarily focus on racial issues in its sociology department this semester, according to ProPublica. Looking to appease those same Republicans, the presidents of some of Florida's public colleges have announced a policy barring classes that "compel" beliefs in ideas such as critical race theory. (It's unlikely any current course mandates that students agree with certain ideas, but this policy is likely to make professors nervous about even discussing them.)

Tweet Share on LinkedIn

## TikTok dead for college students? Florida's flagship university hints at likely ban on campus; others may follow

Florida Politics | 419,094 unique visitors per month

Is TikTok dead for Florida college students? The University of Florida (UF) is warning there is a "strong possibility" it will ban TikTok from its wired and wireless computer networks on campus. That would effectively block access to the popular social media platform for students and faculty in dormitories, classrooms, lecture halls, cafeterias and sporting events — even walking across the school's grounds. A University of South Florida spokesperson said the university hadn't made a decision on similar TikTok guidance. Both the University of West Florida and University of North Florida are closely monitoring TikTok security developments but haven't issued a recommendation or ban yet, officials at the schools said. Florida International University and the University of Central Florida haven't made any public announcements regarding TikTok.

Similar Stories:
WGCU | TikTok dead for college students? Florida's flagship university hints at likely ban; others may follow
WUWF | TikTok dead for college students? University of Florida hints at likely ban on campus, and others may follow

Tweet Share on LinkedIn

## Cordyceps is a real fungus—but is it dangerous?

NewsyList | 5,624 unique visitors per month

NewsyList | 3,024 unique visitors per month

An ant, no longer in control of its body, crawls away from its colony, hangs perilously on a leaf, and waits to die as a fungus consumes its body, emerges from its head, and releases spores into the air. "They're like these grim little Christmas ornaments out in the forest," says Ian Will, a fungal geneticist at the University of Central Florida, where these zombified ants can be found. What if this parasitic fungus could do the same thing to us? That's the premise of the new television show based on the video game The Last of Us in which, as a result of warming temperatures caused by climate change, a fungus takes over the world and turns humans into parasite-controlled zombies. "In a fantastical way, the logical links are there, but it's not likely to happen in real life," says Will. But while scientists aren't worried about fungi evolving to turn people into zombies, rising temperatures do pose a real risk of making fungal infections worse.

Similar stories:
20 Minutos | El hongo de 'The Last of Us' es real: ¿podría llegar a infectar a seres humanos?
Czechia Posts English | Can mushrooms take over humans like in Last of Us? There are many dangerous species

**Tweet Share on LinkedIn**

## Governor Makes 24 Appointments to Various State Boards, Corporations, Commissions, and Authorities

WQCS News | 10,183 unique visitors per month

Governor DeSantis has made 24 appointments to various state boards, corporations, commissions, and authorities. Including some with ties to the University of Central Florida. Sandra Einhorn - Einhorn is the Executive Director of the Coordinating Council of Broward. She previously served as the Executive Director of Rebuilding Together Broward. Einhorn earned her bachelor's degree from the University of Central Florida. These appointments are subject to confirmation by the Florida Senate. Nicole Gomez-Goldmeier - Gomez-Goldmeier, of Coral Gables, is a Partner at LSN Partners, LLC. She currently serves on the Board of directors of the Friends of the Israel Defense Forces and is a Florida Registered Paralegal. Gomez-Goldmeier earned her bachelor's degree in political science from the University of Central Florida.

**Tweet Share on LinkedIn**

## Orlando joins national march for abortion rights

Orlando Weekly | 621,570 unique visitors per month

After a long year of attacks on abortion rights, Florida's LGBTQ+ communities and the teaching of "controversial" issues in classrooms (and the faculty/teachers who facilitate it), Orlando Democrats kicked off 2023 with a rally in support of abortion access. Under overcast skies, a crowd of about 200 people gathered downtown at Orlando City Hall early Saturday afternoon. A counter-protest was also scheduled, but ended up being just, like, five lonely people standing in front of the Bank of America building. Saturday's pro-choice rally, organized by State Rep. Anna Eskamani as part of a national weekend of action for abortion rights, was staged just one day before the 50th anniversary of the U.S. Supreme Court's landmark Roe v. Wade decision, which guaranteed a constitutional right to abortion. It was just one of at least 18 planned events in Florida, including an event in Tallahassee on Sunday that's getting a visit from special guest Vice President Kamala Harris. Now, we're not only fighting these threats to our bodies, but in the state of Florida, we are fighting threats to our minds, to the freedom to learn about the complexity and wonder of difference and diversity in our world," said Dr. Jen Sandoval, a UCF professor and chief negotiator for her union, the United Faculty of Florida at UCF. "These attacks are based in fear," she said, "and I gotta tell you, they should be afraid, because we are

not backing down."

Tweet Share on LinkedIn

## Women changing the face of Central Florida law enforcement

WKMG-TV (Orlando, FL) | 2,084,714 unique visitors per month

When you or your family calls police for help, chances are the officers who arrive are going to be men. Law enforcement agencies in Central Florida told News 6 they have been working for years to recruit more women, but many said it has been a challenge. U.S. Census numbers show women make up 51% of the country's population, but they make up only 12-14% of law enforcement, according to the latest data compiled by the U.S. Bureau of Justice Statistics. "We have different positions that we have available," Orange County Sheriff's Deputy Cindy Zayas said. Zayas works as a field recruiter for the agency, and she spent Florida Classic Weekend at a job fair at Amway Center. Zayas said female officers and deputies have an inherent skill that helps them more than men. "Research has shown that we are better with the victims, especially with sexual assault and child abuse. We are very compassionate," she said. "We have a really big role in law enforcement that's very beneficial to the community, as well as our fellow officers." "Law enforcement has been calling me since I was little, and that's when I decided to do it," said Madison DaSilva, a criminal justice major at the University of Central Florida. She stopped by Zayas' booth at the job fair and expressed interest in joining OCSO. "I'm like any woman that wants to know more women in law enforcement, but it's more important to me about who's right for the job," she said. "You know, you do need women so that you can connect with other women in the community, but the most important thing to me is the safety of the community -- whether that be men or women."

Tweet Share on LinkedIn

## UCF police warn community to be cautious after vehicle burglaries

Yahoo News and WFTV (Orlando, FL) | 63,418,036 unique visitors per month

The University of Central Florida is asking students to be mindful of recent vehicle burglaries. UCF Police are investigating crimes reported from the Pointe at Central apartments on Wednesday. According to a release, residents found their cars unlocked and missing items. UCFPD said they will continue to look into these crimes and advise students to stay aware, lock their vehicles and avoid leaving valuable items in their cars.

Tweet Share on LinkedIn

## 'Willing to Fight': Residents rise up against development that could erase historic Florida town's rich Black heritage

Southern Poverty Law Center | 1,129,912 unique visitors per month

When thousands of festival-goers descend on Eatonville, Florida, this month to celebrate the legacy of literary giant Zora Neale Hurston they will, by their presence, honor the community dubbed "The Town That Freedom Built" for its proud history as one of the oldest incorporated Black communities in the U.S. But while they are enjoying the annual festival that since 1990 has brought live music, literary symposia, theatrical productions and art exhibits to Eatonville, where Hurston grew up, the 135-year-old town will be on the brink of a decision that will determine its future. Eatonville is "a remarkably well-documented, historically Black township with ties to a major Black literary figure, and those two things together give it a major punch," said Scot French, an associate professor of history at the University of Central Florida who has spent years studying the community. "All that I think is endangered by this development, because there is no effort being made to ensure that a sense of this great history, this gift, will

because there is no effort being made to ensure that a sense of this great history, this gift, will be built into it. People are just tired. They don't think enough attention has been given to the possibilities."

Tweet Share on LinkedIn

## DeSantis keeps waging culture wars as more GOP critics emerge

South Florida Sun Sentinel | 1,898,947 unique visitors per month

Instead of easing up on a two-year culture war in Florida, Gov. Ron DeSantis is doubling down on his anti-"woke" agenda as potential rivals for the GOP presidential nomination target him. He's surveying state universities and colleges for diversity, equity and inclusion and critical race theory programs, apparently to target them for budget cuts, as well as asking how much the schools are spending on gender-affirming care for transgender students. He's attacking COVID-19 vaccines and drug stores, lambasting President Biden's immigration and economic policies, ridiculing California Gov. Gavin Newsom's pandemic protocols and railing against the federal government's caution about gas stoves, even producing flags with stoves on them. Aubrey Jewett, a political science professor at the University of Central Florida, said DeSantis may truly believe these are important issues as a social conservative. But he probably also thinks that pushing the same policies that helped him win re-election by a landslide and raise a record amount of campaign contributions will help him win the Republican primary for president. The agenda helps him "make national headlines and prepare for a possible presidential run," Jewett said. "It keeps him in the mind of the voters."

Similar Story:
The Spokesman-Review | DeSantis keeps waging culture wars as more GOP critics emerge

Tweet Share on LinkedIn

## Elon Musk's Twitter woes prove he's no champion of democracy

The Daily Targum | 110,405 unique visitors per month

When Twitter CEO Elon Musk first indicated an interest in acquiring the platform early last year, he made one point abundantly clear: His top priority was protecting what he called "free speech." "Free speech is the bedrock of a functioning democracy, and Twitter is the digital town square where matters vital to the future of humanity are debated," Musk said in a statement formally announcing his bid for CEO on April 25, 2022. Then, the next day, as a response to the public's uncertainty regarding his acquisition, he added, "The extreme antibody reaction from those who fear free speech says it all." Although his decision to maintain Jones' ban was mostly received with sympathy, not all of Musk's decisions regarding Twitter's reinstated users have been quite as endearing. Soon after announcing his bid, questions arose regarding the fate of the former Twitter account ElonJet, a bot created by University of Central Florida student Jack Sweeney for the purpose of posting publicly available flight information for Musk's private jet. Shortly after his purchase of the company, Musk tweeted, "My commitment to free speech extends even to not banning the account following my plane, even though that is a direct personal safety risk."

Tweet Share on LinkedIn

# Student Media Coverage

## How college students are saving money during one of the worst inflations in over 40 years

NSM Today | 7,236 unique visitors per month

Every Monday and Wednesday, Sara Bibby, senior communication sciences and disorders
major, drives to Universal Orlando's CityWalk to work her eight-hour shift at Quiet Flight Surf
Shop. The rest of the week, she's dealing with her four upper-level classes and sorority
meetings. Bibby's schedule is busy and although she enjoys it, she can't afford to go out and do
anything. From paying for gas, groceries and rent, the rising prices of today's inflation have
taken a toll on Bibby and many other college students. To ease her financial strain, Bibby
turned to money-saving apps such as Zupp. Created by UCF alumnus Brent Henderson, Zupp
gives students a way to save money while also sharing experiences with each other. The
phrase "broke college student" is still prevalent in America. According to the National Student
Financial Wellness study, 70% of college students are stressed out about their finances. From
BOGO deals with friends to free first-visit meals, Zupp has helped college students like Bibby
save money. Henderson said that in a 10-week period, there has been a 50% increase in users,
which he believes is due to the high prices of inflation. He knows there's a higher demand for
this app since students can't pay full price for everything.

Tweet Share on LinkedIn

## Student government senate urges UCF to make Juneteenth a university holiday

NSM Today | 7,236 unique visitors per month

With the support of 11 student organizations, UCF Student Government Senate is fighting to
make Juneteenth a university holiday. UCF Student Government Senate unanimously
passed Resolution 54-23 Thursday, which urges the university to give students, faculty and
staff June 19 off. "This would just reaffirm that this is a safe space for Black/African American
students," said Sierra Holmes, the chair of UCF Student Government Senate's Black Caucus.
Holmes said Juneteenth is a holiday that celebrates the anniversary of when the last slaves in
the U.S. were freed. Jade Collins, UCF Student Government's diversity and inclusion
coordinator, said that Juneteenth is mostly celebrated within the Black community in the
U.S. "As a lot of people know, the Emancipation Proclamation was signed by our president at
the time, Abraham Lincoln, but it wasn't until a few years later that the last African Americans
that were owned by slave owners in Texas, or were enslaved by slave owners in Texas, were
notified that they were now free people," Collins said.

Tweet Share on LinkedIn

# State/National Higher Education News

## Report predicts a better year in admissions; another outlines challenges

Inside Higher Ed | 764,789 unique visitors per month

A new report from the Common Application suggests that this will be better admissions year for
more institutions than last year. The report covers applications submitted by Jan. 1, some but
not all of which are early-decision applications. But Common App officials said they believe that
this report includes many applications that are regular decision as well. Because the COVID-19
pandemic affected all applications, most of the comparisons are to the 2019–20 year, the last
year for which applications were submitted before the pandemic. Through Jan. 1, 2023,
1,079,936 distinct first-year applicants had applied to 841 returning members of the Common
App, an increase of 20 percent from 903,553 in 2019–20. Underrepresented minority applicants
increased by 30 percent over 2019–20, while first-generation applicants increased by
35 percent, nearly three times the rate of continuing-generation applicants over the same
period. Students reporting eligibility for a Common App fee waiver for low-income students

period. Students reporting eligibility for a Common App fee waiver for low-income students increased at over four times the rate of students not reporting fee-waiver eligibility (47 percent versus 11 percent). These figures all are measuring distinct applicants, which means the totals are not inflated by students applying to lots of colleges.

Tweet Share on LinkedIn

## The Plan to Dismantle DEI

The Chronicle of Higher Education | 629,607 unique visitors per month

Two influential conservative think tanks described in detail on Wednesday how legislatures could dismantle the administrative structures that support diversity, equity, and inclusion efforts at public colleges. Model state legislation, written by scholars at the Manhattan and Goldwater Institutes, if passed, would prohibit colleges from hiring diversity, equity, and inclusion officers; bar trainings that instruct staff to identify and fight against systemic racism; eliminate requirements for employees to commit to diversity statements; and could disallow even institutional commitments to social justice and recommendations that students be addressed by their preferred pronouns. "This package is meant to reverse illiberal tendencies that have swept across higher education in the past decade," said Ilya Shapiro, one of the authors of the model bill and a senior fellow and director of constitutional studies at the Manhattan Institute.

Tweet Share on LinkedIn

## States step in to provide information about the return for students on a college education

The Hechinger Report | 172,441 unique visitors per month

When Troy Grant was looking at colleges as a prospective student, he had little idea how much they would actually cost, whether certain degrees would lead to good jobs or other basic information that helps young people make one of the most expensive decisions of their lives. The first in his immediate family to go to college, Grant struggled to understand terms such as "credit hour" and to compare institutions on such things as their graduation rates. "We had the will, but we had no idea what we were doing," he said of himself and his family. "We were navigating a process that was foreign to us." Grant eventually attended a small college in Nashville, graduating in 2004 and ending up as senior director of college access and success at the Tennessee Higher Education Commission. Years later, he said, more data is available, but some students are still not getting all the information they need to make informed choices.

Tweet Share on LinkedIn

## University TikTok bans cause concern and confusion

Inside Higher Ed | 764,789 unique visitors per month

Public university administrators who comply with state policy bans on accessing TikTok via state-owned Wi-Fi networks and devices might understandably expect pushback—or at least frustration—from their student bodies. Instead, many students seem to be indifferent. With a single click on a smartphone, most students can easily turn off campus Wi-Fi and switch to their personal cellular data to continue watching TikTok's endless stream of content. "It's just going to become my mom's problem," said Jack Marshall, a student at the University of Montana, referring to the bump in cellphone bills that will likely result from watching TikToks using data— at least for those without unlimited data plans. "We're not going to stop using TikTok," he said.

Tweet Share on LinkedIn

If you'd like to be added to this distribution list, unsubscribe, or share a news article for inclusion in the next report, please contact Chad Binette at Chad.Binette@ucf.edu.

1

2

3

4

5

6

7

8

9

10

11                                        EXHIBIT H

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**From:** Mark Schlueb MAILER-DAEMON 📎
**Subject:** ■■■■■■
**Date:** January 20, 2023 at 11:19 AM
**To:** Gabrielle Russon gabriellerusson@gmail.com

---

Hi Gabrielle,

Just received this document you requested. Sorry for the delay.

Mark

**Mark Schlueb**
Director, Strategic Communications
**UCF Communications & Marketing**
University of Central Florida

12443 Research Parkway, Suite 301
Orlando, FL 32826-3252
Office: 407.823.0221
Mobile: 407.399.8352
mark.schlueb@ucf.edu
**ucf.edu**

*Please note:* Florida has a very broad open records law (F.S. 119). Emails may be subject to public disclosure.



**Reponse_to_Bochenek_Letter_10 -29-22.pdf**
62 KB